UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| GEORGE L. HUSTED, III, | : | Case No. 1:11-cv-56 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| FORD MOTOR CO., *et al.*, | : | |
| | : | |
| Defendants. | : | |

**DECISION AND ENTRY: (1) DENYING PLAINTIFF'S MOTION TO REVERSE
THE ADMINISTRATIVE DECISION (Doc. 25); (2) GRANTING DEFENDANTS'
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. 37);
AND (3) TERMINATING THIS CASE FROM THE DOCKET**

This civil case is before the Court on the parties' cross motions for judgment: (1)

Plaintiff's motion to reverse the administrative decision (Doc. 25); (2) Defendants'

motion for judgment as a matter of law on the administrative record (Doc. 37); and

(3) the parties' responsive memoranda (Docs. 38, 41, 45).

## I.    PROCEDURAL HISTORY AND BACKGROUND FACTS

Plaintiff George L. Husted, III, brought this action against Defendants Ford Motor

Company and Ford Motor Company Salaried Disability Plan (the "Plan") under the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

Plaintiff was hired in 1989 by Ford, where he worked as a manufacturing engineer

for almost twenty years. (Doc. 29 at 16, 158-159). Plaintiff requested disability leave in

2007 due to pain in his lower back, a condition for which he had received medical

treatment for several years. (*Id.* at 158-159, 185). His last day of work was January 19,

2007.  (*Id.* at 185).

On January 26, 2007, Plaintiff filed a disability claim with the Plan's claims processor, UniCare, due to alleged chronic back pain.  (Doc. 29 at 14).  To be eligible for disability benefits, Section 3 of the Plan states that an employee must be "an active employee with a disability."  (*Id.* at 359).  A "disability" is a condition that renders the employee "Disabled" as defined in Section 2.09 of the Plan.  (*Id.* at 355).  Section 2.09 provides:

> "Disabled" shall refer to an Employee who is unable to work due to an accident, illness, or pregnancy-related condition. "Disabled" shall not include any Employee who is unable to work because of Elective Surgery.  "Disabled" under Short-term Benefits shall refer to an Employee who is unable to do his/her job or any comparable job at the Company.  "Disabled" under Long-term Benefits shall refer to an Employee who is unable to engage in regular employment or occupation with the Company.

(*Id.*)

On February 15, 2007, Plaintiff underwent surgery – specifically, an anterior lumbar fusion, performed by Dr. Michael Kramer.  (Doc. 29 at 186-188).  The surgery did not remedy the underlying condition, and in the months after his surgery, he continued to experience pain in both his lower back and legs.  (*Id.* at 16-19).

In June 2007, an independent medial examination performed by a neurosurgeon, Dr. Stephen Eichert, confirmed that Plaintiff was experiencing "persistent back and bilateral leg pain."  (Doc. 29 at 158-159).  Noting that Plaintiff's job as an engineer involved "some physical labor" and "prolonged standing and walking daily," Dr. Eichert

concluded that Plaintiff was not ready to return to work.  (*Id.*)

Plaintiff's physicians did not recommend further surgery; instead they prescribed a variety of pain medications and assigned Plaintiff to a pain management specialist.  (Doc. 29 at 16-19, 140, 143-144).  The disappointing outcome of the surgery and the continuing pain Plaintiff experienced took a psychological toll on him, and he was also treated for depression during this time.  (*Id.* at 124).

A.    **The Ford Plan Denies Plaintiff's Benefits**

Upon verification of Plaintiff's condition, his application for disability benefits was initially approved from January 30, 2007 to September 21, 2007.  (Doc. 29 at 479). On October 5, 2007, UniCare informed Plaintiff that he failed to provide medical documentation to support continuing his disability benefits beyond September 21, 2007. (*Id.* at 62).  Plaintiff's payments were suspended pending receipt of the requested documentation.  (*Id.* at 479).  The Plan's consideration of his appeal took six months, during which time he was without disability benefits.  On April 2, 2008, UniCare advised Plaintiff that the Plan would reverse its earlier decision and his benefits would be reinstated.  (*Id.* at 90).

Prior to the commencement of Plaintiff's restored disability benefits, Unicare received a tip that Plaintiff owned and was operating a business known as A&G Builders, Inc., and therefore suspected that Plaintiff was working outside of Ford while claiming disability benefits.  (Doc. 29 at 458).  When UniCare first learned that Plaintiff appeared

to be working, it did not immediately terminate his benefits. Rather, UniCare notified Plaintiff that it was in receipt of additional information that required further investigation. (*Id.* at 241). UniCare informed Plaintiff that his disability benefit payments would be suspended pending the results of the investigation. (*Id.*) Plaintiff's benefits were never reinstated. Defendants advised Plaintiff, by letter dated June 12, 2008, that it would not reinstate his benefits on the basis that he purportedly was "engaged in employment outside the Company." (*Id.* at 265-267).

As part of its investigation, UniCare hired private investigators to acquire additional information regarding Plaintiff's role with A&G Builders, Inc. and any other business entities. On April 22, 2008, the private investigators prepared a report for UniCare detailing the results of an assets check and database search. (Doc. 29 at 207-220). The database search revealed that Plaintiff appeared to be actively working for at least three business entities: A&G Builders, Inc., Bello Homes, LLC, and the New Richmond Ice House. (*Id.* at 219).

### 1.    *Owner and Operator of A&G Builders, Inc.*

According to information posted on A&G Builders, Inc.'s website, as of May 2008, the company was an "award winning Custom Home Builder, General Contractor and Real Estate Developer owned and operated by Angie and George Husted." (Doc. 29 at 272). On the website, Plaintiff made numerous representations regarding the work he performed for this company, including:

  • Angie and George [Husted] work together with professionals to customize each

-4-

and every aspect of your project.

- Angie and George are proud of their design and build process and will work with an architect from existing plans.

- We put in extra effort in the design stage to make sure all the details have been thought out before we ever lift a hammer.

- Angie and George are personally involved with each construction project they take on.

- One on One direct communications and emails are tools Angie and George use to give A&G Builders and their customers a strong competitive advantage.

- Angie and George will work with you and your family through the entire process.

(*Id.* at 272-273).

Additionally, the website cited Plaintiff's particular skills and experience to distinguish A&G Builders, Inc. from other real estate construction and development companies:

- George Husted was born into this business, following in his parent's footsteps.

- The Husted family has worked in Real Estate, and General Construction for nearly 60+ years.

- Email and open phone lines to the customers are tools A&G Builders, Inc. uses to give our company a competitive advantage. Contact Angie or George Husted for a Project Consultation.

(*Id.* at 273).

### 2.    *Operations Manager of Bello Homes, LLC*

UniCare's investigation also revealed that, in 2005, Plaintiff filed documents with the Ohio Secretary of State to form Bello Homes, LLC, with the stated purpose to "acquire, own, maintain, subdivide, develop, mortgage and build single-family

-5-

residences." (Doc. 29 at 281-282). As of April 2008, the company's website stated that "Bello Homes brings together the combined wisdom and expertise of Holt Custom Homes and A&G Homes to provide a truly unique building experience." (*Id.* at 284). Also, a section of the website, titled "More Info – Contact Us," identified Plaintiff as the company's "Operations Manager" and provided his contact information for potential customers. (*Id*. at 285).

### 3. *Owner of New Richmond Ice House*

Finally, UniCare's investigation determined that Plaintiff owned the "Ice House," an Ohio state liquor agency in New Richmond, Ohio. (Doc. 29 at 219, 301). According to an advertisement posted on a third-party website, the store sold "liquor, beer, wine, ice, and lottery tickets." (*Id.* at 301). This advertisement was updated on January 7, 2008, during Plaintiff's disability leave. (*Id.*) In the advertisement, Plaintiff provided his own email address to potential customers. (*Id.*)

As of March 5, 2008, Plaintiff was also attempting to rent the Ice House property and had posted a listing on a commercial real estate website. (Doc. 29 at 288). He was marketing the property to potential buyers as either a restaurant or drive-thru and was seeking a rental rate of $2,450 per month. (*Id.*)

### B. Undercover Investigation

On May 9, 2008, private investigators hired by UniCare conducted an undercover investigation, which included video surveillance. (Doc. 29 at CD). The private

investigators posed as potential buyers and contacted Plaintiff to set up a tour of condominiums for sale through A&G Builders, Inc. (*Id.* at 221-226, CD). The private investigators requested Plaintiff's personal involvement, and Plaintiff then on his own initiative invited the private investigators for a personal tour of homes in another subdivision, including Plaintiff's own residence. (*Id.* at 222, CD). Plaintiff also suggested that the private investigators should consider purchasing the Ice House property as a possible commercial investment. (*Id.* at 222). In total, Plaintiff spent approximately three hours with the private investigators. (*Id.* at 223-226).

During these three hours, Plaintiff provided the private investigators with business cards that included his contact information and identified his job title as "Builder/Developer." (Doc. 29 at 222). Plaintiff commented that he personally managed all construction and development projects. (*Id.*) Plaintiff then described in detail numerous planned development projects, including: (1) a site plan for development of 18 additional condominium buildings, a club house and pool; (2) a plan for development of four additional lots in his 80-acre subdivision, each with a home costing from $400,000 to over $1,000,000 to construct; (3) a site for development of a corporate building; and (4) plans for construction of river front condominiums, and a large boat storage site. (*Id.*) Plaintiff also informed the private investigators that he owned a state liquor agency in New Richmond, Ohio, known as the New Richmond Ice House, where he also owned additional property for sale. (*Id.*) Finally, Plaintiff commented that he sat on the land development board for the area and was the drummer in a band that played in local bars

and clubs.  (*Id.*)

Despite these alleged statements, Plaintiff claims that he did not have another job while on disability leave.  In a sworn statement, Plaintiff maintains that he and his family had an ownership interest in a real estate investment company, A&G Builders, Inc., as well as two other partnerships.  (Husted Aff, ¶¶ 4-5; Doc. 29 at 316-318).  His ownership in these groups predated the commencement of his disability leave.  While these investments may have produced revenue after his disability leave began, Plaintiff maintains that he performed no "work" for A&G or the two partnerships during his disability leave.  (*Id.* at ¶¶ 10-11).  Regarding the New Richmond Ice House, Plaintiff alleges that the store was shut down for part of 2007 and reopened with limited hours and then was principally managed by his wife and another employee.  (*Id.* at ¶ 10).  The store has since closed.  (*Id.*)

### C.     UniCare Determines That Plaintiff Is Ineligible For Disability Benefits

Following its investigation, UniCare reviewed and considered the evidence gathered by the private investigators and determined that, at a minimum, Plaintiff was working for A&G Builders, Inc. during the entire period of his disability leave.  (Doc. 29 265-266).  Because Plaintiff had not obtained prior approval from UniCare to work outside of Ford while on disability, UniCare concluded that Plaintiff was in violation of Section 6.04(v) of the Plan.  (*Id.*)

On June 12, 2008, UniCare notified Plaintiff that he was ineligible for benefits due to his violation of Section 6.04.  (*Id.*)  UniCare offered Plaintiff the opportunity to appeal

this decision by providing copies of his personal 2007 Federal Income Tax Return, as well as the most recent corporate tax return for A&G Builders, Inc. (*Id.*)

### D. Plaintiff Appeals UniCare's Termination Of His Disability Benefits

On July 28, 2008, Plaintiff, through counsel, filed an appeal of UniCare's June 12, 2008 decision, claiming that he had done no more than "monitor" his real estate investments while on disability leave from Ford. (Doc. 29 at 230). As part of his appeal, Plaintiff provided UniCare with his 2007 income tax return and the 2006 corporate tax return for A&G Builders, Inc. (*Id.* at 231-242).[1] Plaintiff also provided UniCare with a statement of a retired Ford employee named John W. McCall. (*Id.* at 261). According to McCall, "[w]e who worked with George were all aware of his outside interest in Real Estate investment and development." (*Id.*) Plaintiff claims that because his former supervisor, who retired in 2006 prior to Plaintiff's disability leave, knew of Plaintiff's outside employment, he had properly disclosed the employment. (*Id.* at 260). Plaintiff's

---

[1] UniCare's review of these records showed that the corporate tax return was signed by Plaintiff on July 28, 2008 as "President of A&G Builders." (Doc. 29 at 231). The return covered the fiscal year of September 1, 2006 through August 31, 2007, the majority of which Plaintiff was claiming disability benefits under the Plan. (*Id.*) The return showed that A&G Builders, Inc. had gross receipts in excess of $1,000,000 during the fiscal year and a gross profit of $44,128. (*Id.*) The company's Form 1120 revealed that the shareholders' equity had increased during the fiscal year by $23,641, and the company had a net income of $23,384. (*Id.* at 234). While the company reported no taxable income for the year, that was the result of a loss carried over from the previous fiscal year (prior to Plaintiff's disability leave). (*Id.* at 234). Additionally, the tax return showed that A&G Builders, Inc. was not simply an investment held by Plaintiff, but was instead a company that required active management. (*Id.* at 237). A&G Builders, Inc. claimed business deductions for the year totaling $18,319, including deductions of $2,391 for automobile expenses and travel, $659 for equipment rental, $2,915 for insurance, $964 for janitorial services, $1,052 for meals and entertainment, $1,057 for office expenses, $338 for telephone and cell phone, and $4,439 for utilities. (*Id.*)

appeal was denied by letter dated October 3, 2008.  (*Id.* at 227-228).  UniCare informed

Plaintiff that it had denied his appeal due to his outside employment with A&G Builders,

Inc., Bello Homes, LLC and the New Richmond Ice House.  (*Id.* at 227).  Due to

Plaintiff's violation of Section 6.04 of the Plan, UniCare upheld its previous finding that

he was ineligible for disability benefits.  (*Id.* at 228).

       **E.**     **Plaintiff Appeals To The Ford Motor Company Salaried Disability
Plan Committee**

On February 16, 2009, Plaintiff appealed UniCare's denial of his disability

benefits to the Ford Motor Company Salaried Disability Plan Committee (the

"Committee").  (Doc. 29 at 313).  Under the terms of the Plan, the Committee is a two to

five-member panel with discretionary authority to administer the benefit structure of the

Plan.  (Doc. 29 at 370).  In this role, the Committee has the authority to determine, upon a

review of all pertinent evidence, whether a claimant is entitled to disability benefits under

the Plan.  (*Id.*)

As part of his appeal, Plaintiff provided the Committee with an affidavit dated

February 13, 2009.  (Doc. 29 at 316-318).  In this affidavit, Plaintiff admitted that while

on disability leave from Ford, he was a part-owner of A&G Builders, Inc.  (*Id.* at 316,

¶4), a part-owner of Bello Homes, LLC with a role in the sale of three properties (*Id.* at

¶5, 10), and a part-owner of New Richmond Party & Deli Dock, LLC, which owns and

operates the New Richmond Ice House.  (*Id.* at ¶6).  Plaintiff also admitted that he had

given a tour of various properties for sale to potential buyers during his disability leave

from Ford. (Doc. 29 at 317, ¶ 8). Although Plaintiff claimed that a real estate agent should have shown the Courtyards at Olive Branch properties, Plaintiff admitted that he nonetheless scheduled an appointment with the potential buyers and showed the properties. (*Id.*) Plaintiff also stated that, on his own initiative, he personally escorted the potential buyers to separate properties at the Point Pleasant Estates, where he also gave them a tour of his personal residence. (*Id.*) Plaintiff further admitted that he suggested to the potential buyers that they should consider purchasing the New Richmond Ice House as a possible commercial investment. (*Id.* at ¶ 9).

The Committee decided by letter dated August 20, 2009, that it would not reinstate his benefits. (Doc. 29 at 323-324).

## II. STANDARD OF REVIEW

The Court reviews *de novo* a denial of benefits under an ERISA plan "unless the benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Univ. Hosps. v. Emerson Elec. Co.,* 202 F.3d 839, 845 (6th Cir. 2000). If an administrator has such discretionary authority, the Court reviews the denial of benefits under the arbitrary and capricious standard. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111 (1989).

The arbitrary and capricious standard applies in the present case because the long term disability insurance policy at issue gives Defendant the "sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder. Defendant's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding." (Doc. 11, Ex. 3 at 32). "When a plan administrator has

discretionary authority to determine benefits, [the Court] will review a decision to deny benefits under 'the highly deferential arbitrary and capricious standard of review.'" *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001) (quoting *Yeager v. Reliance Standard Life Ins. Co.,* 88 F.3d 376, 380 (6th Cir. 1996)).

Nonetheless, as noted by the Sixth Circuit, merely because the review is deferential does not mean that it is inconsequential.  *Moon v. UNUM Provident Corp.,* 405 F.3d 373, 378-79 (6th Cir. 2005).  As the appellate court explained:

> While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber-stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious . . . standard does not require us merely to rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citing *McDonald v. Western-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003)).  Indeed, '[d]eferential review is not no review, and deference need not be abject." *McDonald*, 347 F.3d at 172.  Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues.

*Id.*  Only if the administrative record supports a "reasoned explanation" for the termination of benefits, will the decision be upheld as not arbitrary or capricious. *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000) (cited in *Moon*, 405 F.3d at 379).

## III.    ANALYSIS

The Plan prohibits employees from working outside of Ford while claiming or receiving disability benefits, except in limited circumstances.  Specifically, Section 6.06 provides that "[t]he Participant may pursue and accept employment outside of the Company with the prior approval of the Claim Processor and still be entitled to Benefits

-12-

under the Plan." (Doc. 29 at 366). Section 6.04(v) of the Plan provides the penalty for

violating this provision: "[i]f the Participant is working outside and fails to report his/her

earnings to the claims Processor, benefits will cease." (*Id.* at 365).

> The applicable Summary Plan Description provides:
>
>> If your condition improves, but you are unable to return to work
>> at Ford due to restrictions, under certain circumstances you may
>> work elsewhere and still be entitled to benefits under the Plan. In
>> such cases, you must obtain prior approval from UniCare. Any
>> employment considered must accommodate the restrictions
>> provided by your physician. Violation of this provision will result
>> in a termination of your benefits.

(*Id.* at 342).

## A. Conflict of Interest

First, Plaintiff argues that Defendants' dual function of both determining eligibility

and paying benefits is a conflict of interest. (Doc. 25 at 7-8). However, in order to

establish a conflict of interest, "Plaintiff needs to provide 'significant evidence' that the

alleged conflict of interest influenced [the plan's] decision." *Harbison v. Hartford Life &*

*Accident Ins. Co.,* No. 1:03cv856, 2007 U.S. Dist. LEXIS 41842 at *19-20 (S.D. Ohio

June 5, 2007).[2] The only basis of Plaintiff's conflict of interest claim, other than the fact

that the claim was denied, is Defendants' role as both plan administrator and insurer.

Without more, this factor will be given little weight.

---

[2] *See also Cooper v. Life Ins. Co. of N. Am.,* 486 F.3d 157, 165 (6th Cir. 2007)
(upholding a plan's denial of benefits where the plaintiff merely asserted with "conclusory
statements" that there was an inherent conflict of interest due to the plan's dual function of
making eligibility decisions and paying disability benefits).

**B.**     **Selective Review of the Record**

Next, Plaintiff maintains that the Plan's decision was not the result of a deliberate, principled reasoning process, but was instead based on a selective review of the record. Specifically, Plaintiff argues that the administrative record does not support the Plan's decision that Plaintiff was "working" during the period of his disability leave.

Plaintiff's claim was reviewed by UniCare twice, by Ms. Kong when Plaintiff appealed to the Plan, and ultimately by the Ford Motor Company Salaried Disability Plan Committee (as mandated by the Plan). At each stage, Plaintiff was given an opportunity to present evidence and argument in support of his claim. Plaintiff even had the assistance of legal counsel, who advocated on Plaintiff's behalf to UniCare, the Plan, and to the Committee. (Doc. 29 at 229-230, 260, 313-315, 478, 482).

In the Sixth Circuit, courts generally find a "selective review of the record" only where the plan cherry-picks documents, or intentionally ignores documents favorable to the employee, to support a denial of benefits. *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 359 (6th Cir. 2002) (finding a selective review of the record where the plan provided a consultant with only one of several medical reports, which also happened to be the only report finding that the employee was not disabled).[3]

Plaintiff has failed to identify any evidence that a particular document was

---

[3] *Williams v. Int'l Paper Co.,* 227 F.3d 706, 716 (6th Cir. 2000) (finding a selective review of the record where the plan instructed its consultants not to review additional medical evidence submitted by the employee).

ignored, or that the Plan cherry-picked just a few "bad" documents. Rather, Plaintiff simply argues a different interpretation of the documents submitted to and reviewed by the Committee. (Doc. 25 at 8-11). In applying the arbitrary and capricious standard of review, this Court's role is not to substitute its opinion, or Plaintiff's opinion for the Plan's. *Crews v. Cent. States, Se. & Sw. Areas Pension Fund,* 788 F.2d 332, 336 (6th Cir. 1986). Even if this Court found that Plaintiff's interpretation was reasonable in any respect, if the Plan's interpretation of the documents was also reasonable, the Plan's interpretation controls. *Gardner v. Cent. States, Se. & Sw. Areas Pension Fund,* 14 F.3d 601 (Table) at *7 (6th Cir. 1993).[4]

### 1. *Surveillance*

In denying Plaintiff benefits, the Plan relied in part on the results of a "surveillance team" dispatched to observe Plaintiff on May 9-May 10, 2008. (Doc. 29 at 323, 479). The results of this surveillance are reflected in two written reports (*Id.* at 221-116, 268-271) and surveillance video. The surveillance video consists primarily of Plaintiff showing the team around two properties. However, at the time of the surveillance in May 2008, Plaintiff was not receiving disability benefits, as the Plan had terminated his benefits in September 2007.

Defendants rely in part on Plaintiff's purported comment to the surveillance team

---

[4] *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004) ("[w]e must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants").

that he "personally managed" all of A&G's construction projects.[5]  (Doc. 37 at 18; Doc.

29 at 222).  However, Plaintiff disputes that he "managed" A&G during the period of his

disability leave, explaining that the company "did not enter into any new contracts with

customers" after his leave began.  (Husted Aff., ¶ 10).  Nonetheless, Plaintiff did not

dispute that during much of his long tenure with Ford he played an active role at A&G, to

which Ford management never objected.  (Doc. 29 at 261).

Additionally, Plaintiff contends that Defendants relied on the surveillance team's

report (Doc. 37 at 6-7) without regard to the context of the team's visit.  Plaintiff alleges

that the surveillance team approached him about certain property A&G had for sale, and

he directed them to the listed realtor.  Yet they insisted that he show them the property.

(Husted Aff., ¶¶ 6-8).  Despite Plaintiff's suggestion that the surveillance team was

coercive, the Court finds that the context of the surveillance encounter is irrelevant given

its evaluation of the evidence as a whole.

In *Lingo v. Hartford Life & Accident Ins. Co.*, Case No. 1:09-cv-867, 2011 U.S.

Dist. LEXIS 91009 at *3 (S.D. Ohio 2011), this Court reviewed a similar decision

wherein the plan terminated an employee's disability benefits based upon evidence that

the employee was capable of working.  The evidence presented to the plan included a

surveillance video of the employee, written surveillance reports, the employee's own

admissions, and the absence of evidence supporting the employee's eligibility for

---

[5]  The surveillance team provided no audio recording of its surveillance, so the alleged comments by Plaintiff included in the team's report were not verified by any other source.  (Doc. 29 at 474-475).

benefits.  *Id.* at 10.  From these materials, the plan concluded that the employee was capable of performing his occupation on a full-time basis.  *Id.* at 4.  The Court upheld the Plan's decision, finding that the surveillance video, surveillance reports, employee's admissions and the absence of evidence to otherwise support the employee's eligibility was "more than substantial evidence."  *Id.*

Here, as in *Lingo*, the evidence before the Plan included surveillance videos, written surveillance reports, and Plaintiff's own admissions.  On A&G Builders, Inc.'s website, Plaintiff made numerous representations regarding his active role in managing the company and its construction and development projects.  (Doc. 29 at 272-273).  On Bello Homes, LLC's website, Plaintiff was identified as the building and development partnership's "Operations Manager."  (*Id.* at 285).  On an online advertisement for the New Richmond Ice House, updated on January 7, 2008, Plaintiff marketed the store's products and provided his email address to customers.  (*Id.* at 301).

Plaintiff maintains, however, that the Plan ignored his explanation about the content on the A&G website:

> The A&G website contains an "About Us" page. To my knowledge, the statements contained there about my wife's role and my role with A&G have not been updated since 2005 or earlier. That page does not accurately describe my role with the company for the period of my disability leave.

(Doc. 29 at 316-318; Husted Aff., ¶ 11).  The Court finds this statement to be ambiguous. While Plaintiff claims that the website is out-of-date and does not accurately describe his

-17-

role, he fails to disclaim a role or explain the extent of his role.

In recommending the denial of Plaintiff's final appeal, the Plan's non-medical staff described the results of the surveillance as follows:

> Surveillance was performed on 2 separate occasions; 5/9/08 and 5/10/08. The surveillance from both 5/9/08 and 5/10/08 states "The claimant was observed entering and exiting a motor vehicle, condominiums, his residence, walking, walking steps, bending, standing for long periods of time, and twisting his back left to right normally during the observations. He wore no visible orthopedic brace and movements were normal.

The Claimant's facial expressions show no signs of pain or discomfort." (Doc. 29 at 479). Finally, Plaintiff maintains that Defendants should not have considered his medical condition when it terminated his benefits. Unlike the plan in *Lingo*, the Ford Plan did not forward the video to Plaintiff's medical team, or even one of the Plan's own physicians, for their review and comment.[6] However, the fact that the surveillance reports mention Plaintiff's physical appearance does not suggest that his physical appearance is what Defendants ultimately based their opinion on in making their determination. It is clear from the record that Plaintiff's claim was denied because he worked while claiming disability benefits, not based on an evaluation of his medical condition.

### 2. Tax Returns

---

[6] In *Lingo*, 2011 U.S. Dist. LEXIS 91009 at *2, the plan obtained surveillance video depicting the plaintiff regularly visiting his health gym to work out, which contradicted his claim of total disability. However, the plan did not immediately terminate the plaintiff's benefits. Instead, it sent copies of the surveillance video to two of plaintiff's own physicians for their comment. *Id.* The plan then submitted the video and the treating physicians' feedback to two additional doctors for independent reviews, after which the plaintiff ultimately decided to terminate the plaintiff's benefits. *Id.* at *3.

The Plan also relied on certain information set forth in tax returns, in particular A&G's tax return for 2006. A&G's tax return included the first 7 months of Plaintiff's disability leave and was signed by Plaintiff as "President of A&G Builders, Inc." on July 28, 2008. (Doc. 29 at 231). The tax deductions claimed by A&G Builders, Inc., included deductions for business meals and entertainment, office expenses and travel, and indicate that the company required Plaintiff's active management. (*Id.* at 237).

Plaintiff argues that The Plan disregarded the fact that the A&G tax return does not reflect income that A&G earned during Plaintiff's disability leave. Specifically, Plaintiff maintains that the 2006 return covered the period of September 1, 2006 to August 31, 2007, and it is therefore not apparent from the tax return whether any of A&G's total sales were generated after Plaintiff's disability leave began in January 2007. (Doc. 29 at 246). Plaintiff provided a sworn statement to the Plan indicating that he did not manage A&G during this period and that "the company did not enter any new contracts with customers." (Husted Aff at ¶ 10). Plaintiff explained, through his counsel's letter, that these returns reflected income earned as result of real estate contracts executed before his leave began. (Doc. 29 at 227-228).[7]

Plaintiff's suggestion that he did not profit from any outside employment is simply

---

[7] Additionally, Plaintiff suggests that the Plan belatedly notes that he should have produced copies of the A&G contracts as part of his administrative appeal. (Doc. 37 at 23). The Plan maintains that even if Plaintiff had produced the contracts, the signature dates are not dispositive of whether Plaintiff worked while claiming disability benefits. (Doc. 4, fn 2). The Court agrees.

not supported in the record. Based on the tax returns submitted by Plaintiff, A&G Builders, Inc. earned gross receipts in excess of $1,000,000 and a gross profit of $44,128 for the 2007 fiscal year. (Doc. 29 at 231). Plaintiff and his wife personally realized these earnings as the owners and shareholders of A&G Builders, Inc. (*Id*. at 231, 316, ¶4). Thus, even if the Plan prohibited only work that resulted in "earnings" - which it does not - Plaintiff's earnings were more than sufficient to establish that he was working and earning.[8]

### 3. DeMinimis Work

Although Plaintiff denies the allegation that he was "working" during his disability leave, he argues in the alternative, any such alleged work performed was *de minimis*. Plaintiff maintains that based on the administrative record, one cannot reasonably conclude that he engaged in "substantial gainful activity" for his family's real estate company or other investment groups. At most, any work he performed was *de minimis* and therefore insufficient to warrant termination. Plaintiff argues that because he did not receive any "earnings" from such "work," he did not violate the Plan's prohibition against working while claiming disability benefits.

The term "work" is undefined in the Plan. As such, the Plan reasonably applied

---

[8] Plaintiff argues that Defendants miscalculated his alleged weekly earnings from A&G, because Defendants erroneously attribute all of the income to Plaintiff, when actually he was one of four owners of the company. (Husted Aff., ¶ 4). Assuming there were four owners, the proper calculation of Plaintiff's weekly earnings would be $212, not $850 (with a gross profit of $44,128). Regardless, pursuant to the express language of the Plan, all work must be reported and there are not stated exceptions based on the amount of work.

the plain and ordinary meaning of the term to determine that Plaintiff's numerous outside business activities constituted "work."  *Williams,* 227 F.3d at 711 ("When interpreting ERISA plan provisions, general principles of contract law dictate that we interpret the provisions according to their plain meaning in an ordinary and popular sense. In applying the 'plain meaning' analysis, we 'must give effect to the unambiguous terms of an ERISA plan.'").  The evidence supports a finding that Plaintiff fulfilled duties for at least three different business entities and, in the eyes of the Plan, "worked" while claiming disability benefits under the Plan.  (Doc. 29 at 323-324).  Even assuming *arguendo* that Plaintiff did no more than "own" three businesses and "monitor" his investments while claiming disability benefits, as Plaintiff suggests, the Plan's conclusion that such activities constituted "work" within the meaning of the Plan was still reasonable.

In his affidavit, Plaintiff admitted that he was a part-owner of A&G Builders, Inc. since 1994, a part-owner of Bello Homes, LLC since 2005, and a part-owner of New Richmond Party & Deli Dock, LLC since 2005.  (Doc. 29 at 316, ¶¶ 4-5).  With respect to Bello Homes, LLC, Plaintiff admitted that he played a role in the sale of at least three properties while on disability leave from Ford.  (*Id.* at 317, ¶10).  Plaintiff also admitted that he had attempted to sell properties owned by A&G Builders, Inc. and the New Richmond Party & Deli Dock, LLC during his disability leave.  (*Id.* at ¶7-9).

Moreover, The Plan requires employees claiming disability benefits to obtain prior approval from UniCare for all outside employment.  (Doc. 29 at 342; Section 6.06 of the Plan, Doc. 29 at 366).  There are no stated exceptions based on the amount of work

performed or profits earned.  All work must be reported so that any disability benefit payments may be properly off-set by any additional income.  (Section 6.06 of the Plan, Doc. 29 at 366).  Set-off is made for all earnings over $150 per week.  (*Id.*)  Here, Plaintiff's average earnings were nearly $850 per week from A&G Builders, Inc. during the 2007 fiscal year.[9]  (Doc. 29 at 231).  Accordingly, to the extent Plaintiff argues for a *de minimis* standard, Plaintiff's work would not qualify.

In *Johnson v. Bell*, the Eighth Circuit U.S. Court of Appeals reviewed a plan administrator's decision that an employee was ineligible for disability benefits based upon evidence that the employee had earned outside wage and self-employment income while on disability leave.  468 F.3d 1082, 1085 (8th Cir. 2006).  On appeal, the employee claimed that the plan administrator should not have considered the earnings he received as owner/manager of a landscaping business, because he was not actively involved in any of the actual labor performed by the business.  *Id.* at 1087.  The employee referred to a specific exclusion in the plan that permitted employees on disability leave to "manage[] personal or family investments."  *Id.*  During the appeals process, the plan interpreted this provision as being limited to the management of an investment portfolio, rather than managing or owning an active business.  *Id.*  The Eighth Circuit affirmed the denial of benefits.  *Id.* at 1088.  The Court reasoned that because the plan administrator had the authority to construe the terms of the Plan, the Court was required to give deference to the plan administrator's interpretation.  *Id.* at 1087-88.  Given the plan's language, the Court

---

[9]  Assuming there were four owners, the proper calculation of Plaintiff's weekly earnings would be $212, not $850.  Regardless, this amount would exceed the $150 threshold.

held that it could not find that the administrator's interpretation was unreasonable or constituted an abuse of discretion.  *Id.* at 1088.  Accordingly, the plan administrator was justified in considering the employee's business earnings when determining the employee's eligibility for disability benefits.  *Id.*

Plaintiff's argument is significantly weaker than the unsuccessful plaintiff in *Johnson*.  Here, the evidence shows that Plaintiff was actively involved in the work performed for A&G Builders, Inc., Bello Homes, LLC, and the New Richmond Ice House.  Further, unlike in *Johnson*, there is no exclusion in the Plan's provisions concerning working while claiming or receiving disability benefits that would, even arguably, permit Plaintiff to "monitor his real estate investments."  In the absence of any such provision, the Plan cannot be accused of acting arbitrarily or capriciously by refusing to apply one.

## IV.    CONCLUSION

The evidence in the record overwhelming establishes that Plaintiff's claim was denied because he worked while claiming disability in violation of Section 6.06 of the Plan.  Accordingly, for the reasons stated above, the Court concludes that the plan administrator's decision to terminate Plaintiff's long-term disability benefits was the product of a deliberate principled reasoning process and, therefore, was not arbitrary and capricious.  Accordingly:

1.    Plaintiff's motion for judgment as a matter of law (Doc. 25) is **DENIED**;

2.    Defendants' motion to deny relief and affirm the administrative decision (Doc. 37) is **GRANTED;** and

-23-

3.      This case is **CLOSED**.

**IT IS SO ORDERED.**

Date:  1/24/2012

Timothy S. Black
United States District Judge

-24-